UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
Keith M. James, *pro se*,                                :
                                                         :
                              Plaintiff,                 :
                                                         :          **OPINION AND ORDER**
              -against-                                  :          06-CV-6180 (DLI)(VVP)
                                                         :
                                                         :
Commissioner of Social Security,                         :
                                                         :
                              Defendant.                 :
---------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

        Plaintiff Keith M. James, proceeding *pro se*, filed an application for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the

"Act") on August 20, 2002.  Plaintiff's application was denied initially and on reconsideration.

The Appeals Council remanded the case for further proceedings on August 12, 2005.  Plaintiff,

then represented by counsel, testified at a hearing held before an Administrative Law Judge

("ALJ") on February 24, 2006.  By decision dated March 27, 2006, the ALJ concluded that

plaintiff was not disabled within the meaning of the Act.  On September 15, 2006, the ALJ's

decision became the Commissioner's final decision when the Appeals Council denied plaintiff's

request for review.  Plaintiff filed the instant action seeking judicial review of the denial of SSI

and DIB pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  The Commissioner now moves,

unopposed, for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c),

seeking affirmation of plaintiff's denial of benefits on the ground that the ALJ's decision that

plaintiff is not disabled is supported by substantial evidence.  For the reasons set forth more fully

below, the Commissioner's motion is denied and this case is remanded for further proceedings

consistent with this opinion.

# BACKGROUND

## A.    Non-medical and Testimonial Evidence

Plaintiff, born in 1960, attended school in Guyana through 12th grade.  (R. 820.[1])  Along with his family, plaintiff immigrated to the United States at some point before 1984.  (R. 860.)  Plaintiff worked as a security guard, which included both stationary and patrolling duties.  (R. 832-33.)  Plaintiff then worked as a fire guard for six years until 2000.  (R. 820-21.)  Plaintiff's responsibilities as a fire guard included assessing the fire hazards in his place of employment and writing reports regarding his findings.  (R. 821, 854.)  To perform these duties, plaintiff received six months of on-the-job training.  (R. 821.)  Although the complaint is silent as to when he became disabled, plaintiff alleges that he ceased working in 2000 due to illness associated with an HIV infection.  (Compl. 1, ¶ 4; R. 822, 856-57.)  Notably, plaintiff's complaint does not indicate when he became disabled, however, plaintiff's original application before the Social Security Commission indicated that the onset date of his alleged disability occurred on February 1, 2002.  (Compl. 1; R. 818.)

Plaintiff was represented by counsel during his May 5, 2004 and February 24, 2006 hearings.  (R. 818, 849.)  Plaintiff testified that he is a reformed smoker and used to drink alcohol on occasion.  (R. 863-64.)  He denies ever using drugs or having a drug problem.  (R. 864.)  According to plaintiff, he does not have friends and only socializes with family members.  (R. 863.)  During plaintiff's May 5, 2004 hearing, he stated that he suffers from the following: the shakes, nervousness, cold sweats, inability to sleep, diarrhea, a lack of energy, a feeling of weakness, and blurry vision.  (R. 860, 868-70.)  Plaintiff also stated that he has hallucinations, sees shadows, hears voices, feels depressed and confused, experiences anxiety attacks, and has memory loss.  (R. 869-71.)  During plaintiff's February 24, 2006 hearing, he stated that he

---

[1] "R." refers to the administrative record filed by the Commissioner in this case.

suffers from the following: a lack of energy, a feeling of weakness, dizzy spells, back pain, headaches, joint pain, diarrhea, depression, inability to sleep, memory loss, shortness of breath, and double-vision. (R. 823, 824, 826, 827, 829, 831, 833, 836.) Plaintiff also stated that he hears voices and sees shadows. (R. 831.) Plaintiff takes a variety of medications for his ailments, including Ibuprofen, Namenda, Gabapentin, Risperdal, Epzicom, Diphenhydramine, and Kaletra. (R. 453.)

**B.      Medical and Psychiatric Evidence**

In January 2002, plaintiff visited the emergency room at Kings County Hospital Center ("KCHC"), complaining of itching all over his body, as well as abdominal pain and bloody stool. (R. 147-48, 151.) An emergency room physician diagnosed plaintiff with psoriasis and dermatitis, gave plaintiff an ointment, and referred him to a dermatology clinic. (R. 147-48.) After plaintiff's second visit to a dermatologist, which resulted in a diagnosis genital warts and a possible diagnosis of syphilis, he was referred to a sexually transmitted disease ("STD") clinic. (R. 153.) Laboratory tests performed by the STD clinic confirmed that plaintiff tested positive for herpes simplex type 2 and HIV. (R. 155-56.)

In April 2002, plaintiff visited KCHC complaining of headaches and joint pain. (R. 161.) Measuring 5 feet 4 inches tall and weighing 127 pounds at that time, plaintiff stated that he normally weighed 170 pounds. (R. 161, 163.) Dr. Paul Riska's examination of plaintiff proved uneventful, but the doctor ordered laboratory and blood tests, including tests for hepatitis. (R. 164.) Later that month, plaintiff also visited a dietitian for the purpose of preventing further weight loss. (R. 179.) Plaintiff was given a dietary plan. (*Id*.)

Clinical notes from plaintiff's regular visits to Dr. Riska from May through July of 2002 indicate that a rash he developed continued to improve, he tolerated his medication, was

asymptomatic of AIDS, and plaintiff reported that he was doing well and had "no complaints." (R. 181, 183, 193, 194.)  Plaintiff's blood tested positive for hepatitis A and B at that time.  (R. 180.)

In September 2002, plaintiff again visited Dr. Riska, complaining of pain all over his body, occasional back pain, and occasional bloody stool.  (R. 202.)  Dr. Riska's exam revealed that plaintiff had no oral thrush and had full muscle strength in his extremities.  (*Id*.)  Dr. Riska assessed plaintiff with nonspecific problems related to AIDS and indicated that plaintiff's symptoms could relate to his noncompliance with medication.  (*Id*.)

At the request of the Commissioner, Dr. Soo Park also examined plaintiff on September 23, 2002.  Plaintiff reported suffering from night sweats, nausea, vomiting, diarrhea, and dizziness.  (R. 398-400.)  Dr. Park concluded that plaintiff had no oral thrush and had full range of motion in his neck and spine, as well as normal sensation and muscle strength.  (R. 398-99.)

Four days later, plaintiff visited Dr. Riska complaining of genital warts.  He denied having diarrhea, shortness of breath, coughing or chest pain at that time.  Dr. Riska referred plaintiff to the STD clinic.  (R. 212-13.)  Plaintiff continued to visit Dr. Riska through February 2003. During these visits, Dr. Riska noted that plaintiff's skin problems were resolved and he did not present oral thrush, but that plaintiff complained of generalized pain, weakness, and back pain, which could be relieved by sitting.  (R. 215, 226, 238.)  Plaintiff's hepatitis test was negative. (R. 249.)  Dr. Riska's assessment of plaintiff was asymptomatic AIDS.  (R. 194, 227, 230, 291.) For the duration of the six months that plaintiff visited Dr. Riska, plaintiff's body weight ranged from 127 to 132 pounds.  (R. 161, 212, 226, 230.)

In January and February 2003, plaintiff visited Dr. Pierre Arty at a psychiatric clinic.  (R. 381-86.)  During these visits, plaintiff told Dr. Arty that living with his mother was depressing,

he had difficulty sleeping, and he had lost ten pounds during the last four months.  (*Id*.)  Plaintiff denied suicidal plans, but admitted feeling helpless.  (*Id*.)  Plaintiff also stated that he experienced auditory hallucinations about twice a week for the past two or three weeks.  (*Id*.)  Dr. Arty diagnosed plaintiff with major depressive disorder, ruled out a diagnosis of possible dementia and mood disorder, and prescribed Risperdal and Zoloft.  (*Id*.)  After plaintiff reported that his conditions did not change since their second meeting, Dr. Arty recommended an increase in plaintiff's psychiatric medication.  (R. 384.)

In March 2003, plaintiff visited the emergency room of KCHC, and an outpatient clinic, complaining of constant headaches.  (R. 257-60, 262.)  At that time, plaintiff walked without noticeable weakness and exhibited no evidence of sensory or motor deficit.  (R. 260, 262.)  Doctors diagnosed plaintiff with headaches and provided him with Tylenol and Motrin for the pain.  (R. 260.)  Weeks later, after a visit to a nutritionist, plaintiff reported that his headache episodes had ceased.  (R. 263, 265.)

Between March and May 2003, plaintiff's psychiatric symptoms also improved.  (R. 385-87.)  Plaintiff reported that he did not feel as depressed, (R. 386), and although he still heard voices and saw shadows, it was not as often as before.  (R. 385, 387.)  Dr. Arty attributed plaintiff's continued symptoms to the fact that plaintiff failed to take his medication during this period.  (R. 387.)

Plaintiff visited Dr. Pooja Tolaney once every month from July to October 2003.  During these visits plaintiff first complained of generalized body pain and dizziness when bending over, as well as a generalized body ache, and later complained of generalized sharp, needle-like body pain.  (R. 273, 281-83.)  Plaintiff maintained his body weight during this time period, and did not report night sweats, coughing, shortness of breath, nausea, or vomiting.  (R. 275, 281-82.)  Dr.

Tolaney concluded that plaintiff's physical examinations were normal and that his HIV status was stable. (R. 276, 299.)

Plaintiff visited Dr. Riska in December 2003 and visited Dr. Tolaney regularly from March to October 2004. Each of these examinations proved unremarkable as plaintiff's HIV remained stable. In March 2004, plaintiff reported that his depression was under control with medication though, in May 2004, plaintiff reported feeling well but depressed. (R. 298, 309.) In August 2004, plaintiff had no medical complaints and reported that he had been socializing more often. (R. 316.) In October 2004, plaintiff complained of aches and pains and weight loss. (R. 323.) Dr. Tolaney noted that plaintiff reported similar ailments in the prior year and stated that plaintiff's weight had not changed. (R. 323.)

Experiencing pain in his left leg, plaintiff visited the emergency room in November 2004 and Dr. Tolaney in January 2005. Emergency room physician, Dr. Selwin Warerton, diagnosed plaintiff with paresthesia and proscribed Motrin. (R. 335, 342.) Dr. Tolaney noted that x-rays of plaintiff's hip and spine were normal. (R. 349.) An MRI performed on plaintiff's spine in February 2005, however, showed a herniated disc at L4-L5. (R. 350.) Plaintiff's HIV remained stable during this time. (R. 352.)

In March 2005, plaintiff visited an orthopedic clinic for his back pain. (R. 361.) Upon examining plaintiff, Dr. Manoj Mathews noted that plaintiff's range of motion on his lower right extremity was within normal limits, with a muscle strength rating of four out of five, and that, plaintiff had tenderness on his left lower extremity, with a muscle strength rating of four out of five. (*Id*.) Dr. Mathews also stated that plaintiff's bilateral reflexes rated two out of four. (*Id*.)

In April 2005, plaintiff again visited Dr. Tolaney and reported that he felt better after receiving therapy. (R. 362.) In May 2005, however, plaintiff told Dr. Paul Pultorak that he

received four days of physical therapy without relief. (R. 364.) Dr. Pultorak noted that plaintiff's muscle strength rated "5+" and that his patella reflexes rated "2+." Plaintiff described his pain as "stabbing," "intermittent," and improved with medication. (*Id.*) During the examination, plaintiff rated his pain level at a two on a ten-point scale, but stated that he experienced pain on a daily basis at a level of eight on a ten-point scale. (*Id.*) Dr. Pultorak encouraged plaintiff to exercise in an effort to strengthen his abdominal and back muscles and increased the dosage of his medication. (*Id.*) Shortly after plaintiff's visit to Dr. Pultorak, Dr. Tolaney again examined plaintiff in June 2005. Dr. Tolaney noted that plaintiff's weight remained stable at 136 pounds and that his HIV status remained stable. (R. 366.)

In June 2005, plaintiff also visited psychiatrist Dr. Vladimir Ginzburg. (R. 392.) Plaintiff complained of poor sleep, auditory hallucinations, forgetfulness, anxiety, poor appetite, and a feeling of both hopelessness and helplessness. (*Id.*) Plaintiff denied suffering from panic attacks. Dr. Ginzburg noted that plaintiff received some benefit from medication, but that he regularly forgets to take it. (*Id.*) Plaintiff was cooperative, clean, and appropriately dressed, but his mood was sad and affect constricted. (*Id.*) Dr. Ginzburg determined that plaintiff's concentration, short-term memory, and recent memory were impaired. (R. 392-93.) As a result of this evaluation, Dr. Ginzburg concluded that plaintiff suffered from a depressive disorder and proscribed Zoloft, Risperdal, Bendadryl, and Namend. (R. 393.)

In July 2005, plaintiff visited Dr. Amy Wecker, an infectious disease specialist and, aside from reporting that he experienced intermittent palpitations since he began taking anxiety medication, his physical examination was within normal limits. (R. 372, 791.) Plaintiff next visited Dr. Ginzburg who reported that plaintiff's mental state was stable. (R. 394.) Plaintiff stated that on most days his mood was not sad or anxious and that, his ability to sleep had

improved. (*Id.*) Plaintiff also reported that he had a normal appetite and denied experiencing hallucinations, suicidal or homicidal thoughts, delusions or paranoid thoughts. (*Id.*) Upon visiting a pain management clinic in August 2005, plaintiff expressed satisfaction with his pain medication. (R. 373.) Physician assistant Colleen Plummer, noted that plaintiff rated his back pain at level two on a ten-point scale.

Plaintiff returned to Dr. Wecker in October 2005. Plaintiff had no physical complaints and reported that he felt well and was tolerating his medication. (R. 374.) Dr. Wecker's physical examination of plaintiff was within normal limits and resulted in a diagnosis of asymptomatic HIV. (*Id.*) Plaintiff visited the pain management clinic in November 2005. (R. 379.) Ms. Plummer again noted that plaintiff rated his back pain at level two on a ten-point scale. (*Id.*) Plaintiff stated that his pain was controlled without any side effects. (*Id.*)

Finally, plaintiff visited Dr. Ginzburg regularly from September to December 2005. Dr. Ginzburg repeatedly noted that plaintiff's mental condition improved, as plaintiff reported experiencing less anxiety and forgetfulness. (R. 395-97.) Plaintiff also denied experiencing hallucinations, and any suicidal or homicidal thoughts during this period. (*Id.*)

## C.    Functional Capacity Assessments

### 1.        Treating Physicians

After examining plaintiff in September 2003, Dr. John O'Nell of KCHC authored a medical report concerning his condition. (R. 403-06.) Dr. O'Nell began examining plaintiff in May 2002. (R. 403.) Aside from a rash on plaintiff's cheek, Dr. O'Nell reported that plaintiff's physical condition was within normal limits. (R. 405.) Dr. O'Nell also reported that plaintiff had a history of depression and auditory hallucinations and met with a psychologist regularly. (R. 404.) In describing plaintiff's ability to perform work during an eight-hour work day, Dr.

O'Nell stated that plaintiff had no restrictions on walking or sitting, but that plaintiff suffered from generalized weakness and experienced difficulty lifting weight and climbing stairs. (R. 405.) Dr. O'Nell also stated that plaintiff had no restrictions engaging in activities of daily living, had moderate difficulties maintaining social functioning and completing tasks in a timely manner. In light of Dr. O'Nell's findings, he stated that plaintiff could not be expected to work eight hours a day, and suggested that plaintiff was capable of maintaining a twenty-hour per week schedule. (R. 406.)

In October 2003, Dr. Tolaney completed a medical report concerning plaintiff's physical condition. (R. 407-12.) Dr. Tolaney reported that plaintiff's prognosis was good and, that aside from plaintiff's complaints of generalized body aches and a mild rash on his face, the results of the physical examination were normal. (R. 408.) Dr. Tolaney also reported that during an eight-hour work day, plaintiff could sit continuously for six hours, stand continuously for two hours, walk continuously for one hour, frequently lift and carry up to twenty pounds, and occasionally lift and carry up to twenty-five pounds. (R. 409-10.) Plaintiff could also squat and reach occasionally, but could not bend, crawl, or climb. (R. 410.) Finally, Dr. Tolaney stated that plaintiff could not perform strenuous work and needed frequent breaks between work hours. (R. 411-12.)

In November 2003, Dr. Kirk Patterson met plaintiff and authored a report concerning plaintiff's mental condition. (R. 389, 413-21.) Plaintiff complained of intermittent suicidal ideas, auditory and visual hallucinations, a depressed mood, an inability to function, and anxiety symptoms. (R. 389.) Although plaintiff had been taking medication, including Zoloft and Risperdal, he still experienced these symptoms. (R. 414.) Dr. Patterson diagnosed plaintiff with major depression with psychotic features. (R. 413.) In completing the report, Dr. Patterson also

indicated that plaintiff suffered from psychiatric impairments including, but not limited to, the following: pervasive loss of interest in almost all activities, appetite disturbance, sleep disturbance, thoughts of suicide, delusions, paranoid thinking, motor tension, autonomic hyperactivity, apprehensive expectation, severe panic attacks, and recurrent obsessions or compulsions. (R. 419-20.) Dr. Patterson also noted that plaintiff experienced marked difficulty paying bills on time, and would have marked difficulty holding a job, avoiding social isolation, and interacting socially. (R. 415.) Dr. Patterson surmised that plaintiff would not be able to function in a work environment due to these impairments. (R. 416.)

In June 2005, Dr. Tolaney authored another report concerning plaintiff's physical condition. (R. 425-32.) Dr. Tolaney stated that plaintiff had HIV without any opportunistic infections during the prior two years. (R. 425.) Plaintiff also complained of fatigue, weakness, and lower back pain. (*Id*.) Dr. Tolaney also noted that plaintiff suffered from a herniated disc and that, due to this issue, plaintiff could not stand or walk for more than fifteen to twenty minutes. (R. 427.) Dr. Tolaney also suggested that plaintiff could not sit for one-half hour in an eight-hour work day, could not stand or walk and had to lie down for a total of eight hours during an eight-hour work day. (R. 432.) As a result of these limitations, Dr. Tolaney concluded that plaintiff could not work. (R. 427.)

After seeing plaintiff for the first time in June 2005, Dr. Ginzburg wrote a functional capacity questionnaire concerning plaintiff's mental condition. Dr. Ginzburg indicated that plaintiff was moderately restricted in performing the activities of daily living and maintenance of social function, and experienced marked limitation in concentration and persistence or pace, which would result in plaintiff's failure to complete tasks in a timely manner. (R. 435-36.) Dr. Ginzburg indicated that plaintiff had marked limitation in the following categories: 1) satisfying

an employer's normal quality, production and attendance standards; 2) responding to customary work pressures; 3) performing complex tasks on a sustained basis in a full-time work setting; and 4) performing simple tasks on a sustained basis in a full-time work setting. (R. 438.)

Dr. Ginzburg also completed psychiatric evaluation forms regarding anxiety related disorders (Listing 12.06) and affective disorders (Listing 12.04). On the Anxiety Related Disorders form, Dr. Ginzburg crossed out the words "Anxiety Related Disorders" and wrote, "depression" and "dementia" secondary to a medical condition. (R. 439.) On that form, Dr. Ginzburg noted that plaintiff had difficulty falling and staying asleep, and had marked or extreme difficulty concentrating and persisting in tasks. (R. 440, 443.) Dr. Ginzburg did not indicate that plaintiff had any other symptoms. On the Affective Disorders form, Dr. Ginzburg noted that plaintiff experienced the following symptoms: 1) appetite disturbance with weight change; 2) sleep disturbance; 3) psychomotor agitation or retardation; 4) decreased energy; and 5) difficulty concentrating or thinking. (R. 447.) Dr. Ginzburg noted that plaintiff forgets to take his medication and has marked or extreme difficulty concentrating. (R. 448-50.) Dr. Ginzburg did not indicate that plaintiff had any difficulties in performing activities of daily living or social functioning. (R. 448-49.)

After the ALJ denied plaintiff benefits in February 2006, Dr. Ginzburg and Dr. Wecker completed additional psychological and medical evaluations on behalf of plaintiff in May 2006 and July 2006, respectively. Plaintiff submitted those reports to the Appeals Council, which considered them in connection with its review of the ALJ's decision. (R. 6.) Dr. Ginzburg's report differed significantly from the findings he reported in June 2005. (R. 795-804.) In this new report, Dr. Ginzburg noted that plaintiff had moderate difficulty cooperating with others. (R. 797-98.) Dr. Ginzburg also stated that plaintiff had marked or extreme difficulty planning

daily activities, completing tasks in a timely manner, assuming the increased mental demands of competitive work, and sustaining tasks without an unreasonable number of breaks or rest periods. (*Id.*) In stressful circumstances, Dr. Ginzburg noted that plaintiff would present exacerbated signs or symptoms of illness, a deterioration of functioning, and an inability to cope with schedules. (R. 798.) With respect to activities of daily living, Dr. Ginzburg stated that plaintiff has had marked difficulty initiating and participating in activities independently. (R. 803.) Concerning social functioning, Dr. Ginzburg stated that plaintiff has had marked difficulty holding a job and avoiding being fired. (*Id.*) Dr. Ginzburg further reported that plaintiff suffered from a medically documented history of chronic affective disorder of at least two years in duration, causing more than a minimal limitation of plaintiff's ability to do work and that, plaintiff experienced repeated episodes of decompensation. (R. 799.) Dr. Ginzburg also noted that plaintiff's mental state was such that even a minimal increase in mental demands or change in the environment would be likely to cause plaintiff to decompensate. (*Id.*)

Dr. Wecker reported that, plaintiff was handling his HIV infection well due to medication, but noted that plaintiff's severe depression with psychotic features impacted his life. (R. 788.) Describing plaintiff's ability to perform work during an eight-hour day, Dr. Wecker stated, "plaintiff is physically fine, but his severe depression may interfere w[ith] work." (R. 790.) Finally, Dr. Wecker stated that it would not be reasonable to expect plaintiff to perform an eight-hour work day given her objective medical findings. (R. 791.)

### 2. Agency Physicians

At the request of the Commissioner, Dr. Soo Park examined plaintiff in September 2002. At that time, Dr. Park reported that plaintiff had full range of motion in his neck and spine and

that based on his findings, plaintiff had mildly limited capacity to lift, bend, stand, walk, and push and pull arm controls. (R. 398-402.)

Based on a review of plaintiff's medical records and upon hearing plaintiff's testimony, two physicians, Dr. Charles Plotz and Dr. Friedman, testified as medical experts during plaintiff's hearing. Dr. Plotz testified regarding plaintiff's physical ability to work and Dr. Friedman, a clinical psychologist, testified regarding plaintiff's mental impairment. Dr. Plotz stated that, since plaintiff's HIV diagnosis, he had not suffered from any opportunist infections. (R. 837.) Dr. Poltz further testified that, in October 2003, despite plaintiff's complaints of weakness, Dr. Tolaney concluded that plaintiff could perform light work, but not strenuous work. Dr. Plotz also testified that in June 2005, Dr. Tolaney determined plaintiff's residual functional capacity ("RFC") to be level zero, stating that plaintiff's condition required that he lie down continuously for eight hours of an eight-hour work day and he could not lift or carry any weight. (R. 431, 837.) According to Dr. Plotz, that assessment was inconsistent with clinical notes made by Dr. Tolaney, plaintiff's other treating physicians, and a physician's assistant, during that same time period. (R. 838.) For example, in April 2005, Dr. Tolaney noted that plaintiff had been rehabilitating his back and receiving lower back pain therapy and felt "a little better, but not much." (R. 363.) In August 2005, plaintiff visited physician assistant Colleen Plummer, who noted that plaintiff was satisfied with his current pain medication and rated his back pain at level two on a ten-point scale. (R. 373.) In October 2005, Dr. Wecker noted that plaintiff felt well, had no new complaints, and was tolerating his medication well. (R. 374.) Finally, in November 2005, Ms. Plummer again noted that plaintiff rated his back pain at level two on a ten-point scale, and that he stated that the pain was controlled without any side effects. (R. 379.) Dr. Plotz concluded that plaintiff's medical records indicated that he was handling his

HIV infection well, and that the back pain he complained of appeared to be controlled by modest doses of Ibuprofen and Neurontin. (R. 838.)

Dr. Friedman's testimony concerned plaintiff's mental impairment. Dr. Friedman stated that plaintiff's medical record indicated treatment for major depressive disorder with psychotic symptoms. (R. 839.) Dr. Friedman also testified that that the limitations suggested by plaintiff's treating physicians were unduly severe, given their limited time spent with plaintiff. (R. 839-40.) Dr. Friedman believed that while plaintiff's testimony indicated that he was depressed, his medical records indicated that he was still capable of performing simple, routine, low-stress work. (R. 842.) If plaintiff's testimony were to be believed in its entirety, plaintiff would have marked limitations in concentration, persistence, and pace, and moderate limitations in activities of daily living and social interaction. (R. 842.) As a result, plaintiff would not be able to work. (R. 841.) If the ALJ found plaintiff's testimony credible only to the extent that it comported with his medical records, however, Dr. Friedman would have difficulty concluding that plaintiff was disabled. (R. 841-42.)

### 3.    Vocational Evidence

Mark Ramnauth, a vocational expert, reviewed plaintiff's medical records and testified at plaintiff's hearing. Mr. Ramnauth indicated that plaintiff's past relevant work included work as a security guard and as a fire inspector. (R. 845.) Mr. Ramnauth also testified that both of those jobs are simple, routine, and low in stress, though he estimated that work as a security guard could be stressful on occasion. (*Id.*) He testified that the local area supported over 50,000 security guard positions and that approximately twenty-five percent of those positions are "lower stress." (*Id.*) Mr. Ramnauth also noted that even if plaintiff could not perform his past relevant work, each of which carried a Specific Vocational Preparation ("SVP") level of three, and which

he characterized as light (security guard position) and medium duty (fire guard position), plaintiff could perform other work at a light or sedentary level. (*Id*.) Mr. Ramnauth indicated that 5,000 "marker" (merchandise tagging) positions are available locally and that there are over 100,000 of these positions in the national economy. (*Id*.) Working as a marker is light duty work with an SVP level of two. He also stated that plaintiff could work as a light duty or sedentary "assembler." (R. 845-46.) Both of these jobs have an SVP level of two and support 6,000 positions locally and 300,000 positions nationally. (R. 846.) Finally, the vocational expert testified that plaintiff could perform the work of a "surveillance system monitor," which is considered a sedentary position and has an SVP level of two. (*Id*.) There are 5,000 of these positions in the local economy and over 150,000 in the national economy. (*Id*.)

## DISCUSSION

### A.    Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. §§ 405(g), 1383(c)(3). A district court reviewing the final determination of the Commissioner must determine whether the ALJ applied the correct legal standards and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

**B.      Disability Claims**

To receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence that the Commissioner may require. 42 U.S.C. §

423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

An ALJ must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. §§ 404.1520 and 416.920. If at any step, the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(b); 416.920(b). Second, the ALJ considers whether the claimant has a "severe impairment" without reference to age, education or work experience. 20 C.F.R. §§ 404.1520(c); 416.920(c). Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." (*Id.*) Third, the ALJ will find the claimant disabled if his or her impairment meets or equals any impairment listed in Appendix 1.[2] *See* 20 C.F.R. §§ 404.1520(d); 416.920(d).

If the claimant is found to have a "severe impairment," but the impairment is not listed in Appendix 1 and does not meet or equal an impairment listed in Appendix 1, the ALJ makes a finding about the claimant's RFC in steps four and five. 20 C.F.R. §§ 404.1520(e); 416.920(e). In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. §§ 404.1520(e); 416.920(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. In this step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642). If so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(f); 416.920(g).

---

[2] 20 C.F.R. pt. 404, subpt. P, app. 1.

## C.    ALJ's Decision

In this case, the ALJ applied the five-step sequential analysis set forth in 20 C.F.R. §§ 404.1520 and 416.920.  The ALJ resolved step one in plaintiff's favor, determining that plaintiff has not engaged in substantial gainful activity since filing his application.  (R. 26.)  Under step two, the ALJ found that plaintiff's HIV disease, lumbar spine impairment, and depressive disorder with psychotic features were considered "severe" impairments, as defined by the Act. (*Id*.)  The ALJ resolved step three against plaintiff, finding that his impairments did not meet or medically equal one of the impairments listed in Appendix 1 and noted that plaintiff's counsel did not suggest otherwise.  (*Id*.)  In step four, the ALJ analyzed plaintiff's RFC and determined that plaintiff retained the physical and mental ability to perform his previous two jobs.  (*Id*.) Finally, under step five, the ALJ requested testimony from a vocational expert, and held that, even if plaintiff could not perform either of his past jobs, plaintiff had the RFC to perform light or sedentary work, including at least four jobs described by the vocational expert.  (R. at 26-27.)

## D.    Application

The Commissioner seeks judgment on the pleadings, contending that the ALJ's decision is supported by substantial evidence and that the ALJ correctly applied the relevant law. Plaintiff, proceeding *pro se*, did not file an opposition to this motion.  Thus, plaintiff fails to alert the court as to any evidence or testimony that may have been overlooked or improperly weighed, or any other failure on the part of the ALJ that warrants remand or reversal of the ALJ's determination.  In fact, plaintiff claims entitlement to DIB and SSI simply because of "HIV." (Compl. 1, ¶ 4.)  Under these circumstances, the court could grant the Commissioner's motion in its entirety.  *See, e.g.*, *Anderson v. Astrue*, No. 07-CV-7195, 2008 WL 655605, at *9-10 (S.D.N.Y. Mar. 12, 2008).  In light of plaintiff's *pro se* status, however, the court will review the

merits of Commissioner's motion and view the facts most favorably to plaintiff, the non-moving party. Further, the submissions of a *pro se* litigant must be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citation omitted).

### 1.    New Evidence Before the Appeals Council

Under the Act, a claimant may "submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision." 20 C.F.R. §§ 404.970 and 416.1470; *Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996). "If the new evidence relates to a period before the ALJ's decision, the Appeals Council shall evaluate the entire record including the new and material evidence submitted . . . [and] then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Id.* To obtain a review of such evidence, the claimant must show that "the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Sergenton v. Barnhart*, 470 F. Supp. 2d 194, 204 (E.D.N.Y. 2007) (citing *Lisa v. Sec'y of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991)). Materiality means "a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." *Id.* When the Appeals Council fails to consider such evidence, "the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence." *Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009). Furthermore, where newly submitted evidence consists of findings made by a claimant's treating physician, the treating physician rule applies, and the Appeals Council must give good reasons for the weight accorded to a treating source's medical opinion.

*Id.* (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (remanding to the Appeals Council "for a statement of the reasons on the basis of which [the treating physician's] finding of disability was rejected.")); *see also Farina v. Barnhart*, No. 04-CV-1299 (JG), 2005 WL 91308, at *5 (E.D.N.Y. Jan. 18, 2005) (remanding for further proceedings where the Appeals Council failed to acknowledge receipt of new evidence from claimant's treating physician and failed to "provide the type of explanation required under the treating physician rule" when denying review).

In this case, after the ALJ denied plaintiff benefits, plaintiff received reports related to psychiatric and medical evaluations performed by Dr. Vladimir Ginzburg and Dr. Amy Wecker in May 2006 and July 2006, respectively. (R. 805.) Dr. Ginzburg and Dr. Wecker were plaintiff's treating physicians. Plaintiff appealed the ALJ's decision and submitted the reports to the Appeals Council. The Appeals Council considered the reports before it resolved to deny plaintiff's request for review. (R. 6.) It did not, however, provide a detailed written explanation of what weight, if any, it accorded to the new evidence provided by plaintiff's treating physicians. In light of the fact that the reports were authored by plaintiff's treating physicians, and contained new and material evidence, such an omission was improper and is sufficient cause for remand.

Dr. Ginzburg's June 2005 reports reflect his impressions of plaintiff after his first examination on June 13, 2005. (R. 392, 438, 446, 452.) The second set of reports, submitted by plaintiff to the Appeals Council, reflect Dr. Ginzburg's impression of plaintiff after evaluating him on a monthly basis for almost one year. (R. 795.) Not surprisingly, these reports contain much more detail than the first set of reports, which contained many unanswered questions. For example, Dr. Ginzburg's new report concerning plaintiff's affective disorder notes that plaintiff

had moderate difficulty concentrating and cooperating with others, and marked or extreme difficulty planning daily activities, completing tasks in a timely manner, assuming the increased mental demands of competitive work, and sustaining tasks without an unreasonable number of breaks or rest periods. (R. 796-98.) Dr. Ginzburg also stated that, in stressful circumstances, plaintiff would present exacerbated signs or symptoms of illness, a deterioration of functioning, and an inability to cope with schedules. (R. 798.) Dr. Ginzburg further reported that plaintiff suffered from a medically documented history of chronic affective disorder of at least two years in duration, causing more than a minimal limitation of plaintiff's ability to do work and that plaintiff experienced repeated episodes of decompensation. (R. 799.) Plaintiff's mental state was such that even a minimal increase in mental demands or change in the environment would cause plaintiff to decompensate again. (*Id*.) In a separate report, Dr. Ginzburg stated that with respect to activities of daily living, plaintiff has had marked difficulty initiating and participating in activities independently. (R. 803.) Concerning social functioning, Dr. Ginzburg stated that plaintiff has had marked difficulty "holding a job and avoid[ing] being fired." (*Id*.) None of the foregoing symptoms or conditions were noted in Dr. Ginzburg's June 2005 report concering plaintiff's alleged affective disorder condition.

The second report, Dr. Wecker's assessment of plaintiff's physical condition, appears to be less significant. Dr. Wecker noted that plaintiff handled his HIV infection well due to medication and that plaintiff's severe depression with psychotic features impacted his life. (R. 788.) Describing plaintiff's ability to perform work during an eight-hour day, Dr. Wecker stated, "plaintiff is physically fine, but his severe depression may interfere w[ith] work." (R. 790.) Finally, in answering a question provided by the report, Dr. Wecker stated that it would not be

reasonable to expect plaintiff to perform an eight-hour work day given her objective medical findings. (R. 791.)

While some of the information provided by these two reports appears to be cumulative of evidence already included in the administrative record, other information is not. Notably, Dr. Ginzburg's report is significantly more detailed than his first assessment of plaintiff's mental condition in June 2005. Both of these reports appear to shed light on the severity of plaintiff's mental illness and should be considered, along with other information in the administrative record, to determine what impact these evaluations may have on plaintiff's claims of disability. Though the reports post-date the ALJ's decision, the evidence is material as it concerns regular and ongoing treatment of plaintiff's physical and mental illness by both physicians, which began before the ALJ rendered his decision. *Boyd v. Apfel*, No. 97-CV-7273, 1999 WL 1129055, at *5 (E.D.N.Y. Oct. 15, 1999) (finding that a report submitted to the Appeals Council summarizing the findings of an examination that occurred after the administrative hearing concluded was new evidence because it concerned the treatment of plaintiff's ongoing medical condition). Thus, the reports concern the period on or before the date of the ALJ's decision.

The court also finds that, in light of the significant differences between Dr. Ginzburg's June 2005 and May 2006 reports and Dr. Wecker's determination that it would be unreasonable to expect plaintiff to work, there is a reasonable possibility that the ALJ may reach a different conclusion on remand. *Lisa*, 940 F.2d at 43-46 (remanding to the Secretary when new diagnostic evidence would present a reasonable possibility of influencing the Secretary to decide her application differently); *see also Tolany v. Heckler*, 756 F.2d 268, 272 (2d Cir. 1985) (finding new evidence of the seriousness of claimant's condition material). On remand, the ALJ is directed to consider these new reports to the extent they are material, not cumulative, and relate

to the period on or before the date of the ALJ's decision, in light of the evidence already contained in the administrative record. The ALJ is further directed to articulate good reasons for the weight accorded to the medical opinions they contain.

      **2.**     **Substantial Evidence Supports the ALJ's Determination that Plaintiff's Physical Impairments Do Not Meet or Equal a Listed Impairment**

      a.    HIV Infection

A claimant infected with HIV meets the requirements of section 14.08 of the Listing of Impairments if their HIV infection is accompanied by one of several other conditions including: bacterial, fungal, protozoan and viral infections; HIV wasting syndrome, significant weight loss; or various skin conditions that do not respond to treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.08. The medical record in this case clearly demonstrates that none of plaintiff's HIV-related symptoms rose to the level required by section 14.08. First, plaintiff's treating physicians repeatedly reported that plaintiff suffered from asymptomatic HIV without any opportunistic infections. Dr. Riska diagnosed plaintiff with asymptomatic AIDS on several occasions. (R. 194, 227, 230, 291.) Dr. Tolaney repeatedly stated that plaintiff's HIV was stable without opportunistic infection. (R. 276, 299, 352, 366, 425.) Finally, Dr. Wecker noted that plaintiff's HIV infection was asymptomatic and that he handled his infection well due to medication. (R. 374, 788.)

Furthermore, the symptoms plaintiff specifically complained about would not meet the requirements under any subsection of 14.08. For example, a claimant meets the first requirement of subsection H if they experience significant involuntary weight loss. Here, while plaintiff claimed that he normally weighed 170 pounds, this is not reflected in the medical record. (R. 161.) In fact, the medical record reflects that plaintiff's weight remained relatively stable during the period at issue. Measuring 5 feet 4 inches tall, the record confirms that plaintiff's weight

ranged between 125 pounds and 136 pounds between April 2002 and June 2005, and that plaintiff actually gained weight during this time period. (R. 161, 183, 212, 226, 230, 236, 238, 247, 250, 262, 263, 265, 281, 323, 366.) *See Anderson*, 2008 WL 655605, at *13 (finding plaintiff was not disabled under section 14.08H where plaintiff "did not suffer from any significant weight loss during the claimed disability period and actually gained weight since his initial HIV diagnosis"). Therefore, subsection H of section 14.08 is not applicable.

Skin conditions may also qualify as an HIV-related impairment under subsection F when they have "extensive fungating or ulcerating lesions not responding to treatment." While plaintiff's medical records indicate that he developed rashes during the relevant period, they also indicate that plaintiff responded well to treatment and that the rashes healed shortly after they developed. (R. 180, 183, 194, 226, 307, 316.) The record further indicates that plaintiff complained of genital warts. Like plaintiff's rashes, however, his genital warts also resolved with treatment. (R. 194, 226.) *See Roman v. Barnhart*, 477 F. Supp. 2d 587, 598 (S.D.N.Y. 2007) (finding that plaintiff's symptoms did not meet the listing's requirements where those symptoms were "not 'chronic,' but were instead isolated incidents"). Therefore, subsection F of section 14.08 is not applicable either. Accordingly, substantial evidence supports the ALJ's finding that plaintiff's impairments do not meet or medically equal section 14.08 of the Listing of Impairments.

b.      Plaintiff's Lumbar Spine Impairment

A claimant with a lumbar spine impairment, such as a herniated disc, meets the requirements of section 1.04 of the Listing of Impairments if the impairment results in the "compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. The Listing also requires, in relevant part, that such a compromise is

coupled with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). § 1.04A. Plaintiff failed to demonstrate that that his impairment met the requirement of the Listing.

Plaintiff's medical records indicate that his lumbar spine impairment does not meet or medically equal the Listing under section 1.04 because, while plaintiff did suffer from a herniated disc between L4 and L5, there is no medical evidence of nerve root or spinal compromise. (R. 350.) This finding is confirmed by Dr. Plotz, a medical expert, who reviewed plaintiff's medical records and testified during the February 24, 2006 hearing. (R. 837-38.) Though plaintiff reported experiencing lower back and leg pain of varied intensity between February 2005 and July 2005, he expressed satisfaction with pain medication starting in August 2005, and noted that that the pain was controlled in November 2005. (R. 352, 361, 364, 366, 371, 379). Finally, plaintiff does not assert his right to DIB and SSI on the basis of his lumbar spine impairment before this court. As noted, plaintiff's complaint merely asserts the right to benefits due to "HIV." (Compl. 1, ¶ 4.) Accordingly, substantial evidence supports the ALJ's determination that plaintiff's lumbar spine impairment does not meet or equal the Listing under section 1.04.

**CONCLUSION**

In light of the new evidence submitted by plaintiff concerning his mental condition, the court finds that it would be inappropriate to review the ALJ's determination regarding whether plaintiff's mental condition meets or medically equals a listed impairment under 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00. As the record needs further development, the court further

declines to review the ALJ's determination regarding plaintiff's RFC at this time. For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. This case is remanded for further proceedings consistent with this opinion. The Commissioner shall take all steps necessary to prevent any delay in the processing of plaintiff's case and in conducting further proceedings before the ALJ. *See Butts v. Barnhart*, 388 F.3d 377, 387 (2d Cir. 2004).

SO ORDERED.

DATED:      Brooklyn, New York
             August 14, 2009

_____/s/_____

DORA L. IRIZARRY
United States District Judge